UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BETTY E. MARTIN,                   :
                                   :CIVIL ACTION NO. 3:14-CV-1730
          Plaintiff,               :
                                   :(JUDGE CONABOY)
          v.                       :
                                   :
CAROLYN W. COLVIN, Acting          :
Commissioner of the Social         :
Security Administration,           :
                                   :
          Defendant.               :
_____

**MEMORANDUM**

Here we consider Plaintiff's appeal from the Commissioner's
denial of Disability Insurance Benefits ("DIB") under Title II of
the Social Security Act ("Act").  (Doc. 1.)  Plaintiff claims
disability since June 22, 2008 (R. 12), listing the conditions that
limit her ability to work as heart valve replacement, arthritis in
her knees and hips, and depression (R. 170).  The Administrative
Law Judge ("ALJ") who evaluated the claim concluded that Plaintiff
did not have a medically determinable mental impairment.  (R. 15.)
He determined that Plaintiff's severe impairments of "status post
heart valve replacement, and status post right knee replacement"
(R. 14) did not meet or equal the listings (R. 16).  The ALJ also
found that Plaintiff had the residual function capacity ("RFC") to
perform a full range of medium work with the nonexertional
limitation that she needed to avoid hazards due to the risk of
being cut while on her Coumadin regimen.  (R. 16.)  After finding

that Plaintiff was capable of performing past relevant work, the ALJ denied Plaintiff's claim for benefits.  (R. 22-23.)

With this action, Plaintiff argues that the decision of the Social Security Administration is error for the following reasons: 1) the ALJ found Plaintiff's mental health impairment to be non-severe; 2) the ALJ failed to properly evaluate Plaintiff's treating physicians; 3) the reasons the ALJ gave for finding Plaintiff not credible as to the severity of her limitations are not supported by substantial evidence; 4) the ALJ failed to adopt a clear and supported RFC; and 5) the ALJ did not make specific findings regarding the mental demands of Plaintiff's past work.  (Doc. 9 at 2.)  For the reasons discussed below, we conclude Plaintiff's appeal of the Acting Commissioner's decision is properly granted.

## I. Background

### A. Procedural Background

Plaintiff protectively filed a Title II application for DIB on July 19, 2011, alleging disability beginning June 22, 2008.  (R. 12.)  This claim was denied initially on September 6, 2011.  (*Id.*)  Plaintiff filed a written request for a hearing on September 12, 2011, and a video hearing was held before ALJ Theodore Brickell on October 2, 2012.  (*Id.*)  Plaintiff was represented by counsel at the ALJ hearing and a Vocational Expert also testified.  (*Id.*)  In his April 24, 2013, decision, the ALJ concluded that Plaintiff was not under a disability within the meaning of the Social Security

Act from June 22, 2008, through December 11, 2011, the last insured date.  (R. 23.)  As noted above, this determination was made at step four where the ALJ concluded Plaintiff had the residual functional capacity to perform the requirements of her past relevant work.  (R. 22.)

On June 4, 2013, Plaintiff requested review of the ALJ's hearing decision.  (R. 7-8.)  The Appeals Council denied his request for review on July 10, 2014.  (R. 1-6.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

On September 5, 2014, Plaintiff filed the above-captioned matter in this Court.  (Doc. 1.)  Plaintiff filed her supporting brief (Doc. 9) on December 31, 2014, and Defendant filed her responsive brief (Doc. 12) on March 12, 2015.  With the filing of Plaintiff's reply brief (Doc. 13) on March 11, 2015, this case became ripe for disposition.

**B.   *Factual Background***

Plaintiff was born on June 2, 1958, and was fifty-four years old at the time of the ALJ hearing.  (R. 33.)  She did not engage in substantial gainful activity since the onset date.  (R. 14.)  Plaintiff left high school in the tenth grade and has a GED.  (R. 33.)  She has past relevant work experience as a cleaner and order picker.  (R. 22.)

**1.   Summary of Evidence of Physical Impairments**

a.    **Heart Impairment**

Plaintiff underwent aortic valve replacement on January 4, 2008, after being followed for years by the Moffit Heart and Vascular Group because of a bicuspid aortic valve. (R. 560.) She had developed progressive symptoms as of November 2007. (*Id.*) At her February 12, 2008, follow-up visit, it was noted that Plaintiff was doing well and was asymptomatic. (R. 561.) In recording his "Assessments and Recommendations" based on the February 12th visit, Dr. Robert Martin opined that Plaintiff could return to work as a housekeeper and maintenance person, noting "[a]t this point, she has no real restrictions." (R. 562.) Dr. Martin added that Plaintiff would obviously need to be cautious because she was on Coumadin. (*Id.*)

On June 16, 2008, Plaintiff was seen by Dr. Martin for a follow-up regarding her "aortic valve disease." (R. 565.) He noted that she continued to do well from a cardiovascular standpoint. (*Id.*) Dr. Martin also noted that Plaintiff reported "some shortness of breath occasionally at night when she first lies down in bed and needs to take a deep breath, but it resolves rather promptly," but she did not have shortness of breath with exertion as she had prior to the valve surgery. (*Id.*) Dr. Martin recorded that Plaintiff wondered whether the shortness of breath could have something to do with the weight she had put on over the previous few months. (*Id.*) He added that "she has also been under a lot of

stress due to her continued unemployment and financial difficulties at home." (*Id.*)

On January 9, 2009, Dr. Martin evaluated Plaintiff for perioperative risk assessment prior to arthroscopic knee surgery. (R. 568-69.)  He noted that she had improved clinically since the surgery and had little, if any, symptoms.  (*Id.*)  He also reported Plaintiff's social history to be "notable for the fact that she is disabled at this point and no longer working."  (*Id.*)

Plaintiff had an office visit on August 24, 2009, with her primary care physician, Baxter D. Wellmon, D.O., for the purpose, among other things, of discussing filing for disability.  (R. 451.) Plaintiff reported she had difficulty completing home chores such as cleaning and basic homemaker duties due to fatigue and feeling "played out." (*Id.*)  Dr. Wellmon opined that Plaintiff was "unable to work secondary to her cardiac condition with increased fatigue and poor exercise tolerance."  (*Id.*)

On December 17, 2009, Dr. Martin saw Plaintiff for cardiovascular follow-up.  (R. 509.)  In his correspondence about the visit to Dr. Wellmon, Dr. Martin noted that Plaintiff reported that she had been more short of breath with exertion over the previous month than she had been in the past.  (*Id.*)  Specifically she stated that she had to stop and rest frequently when vacuuming, and she could not walk long distances because of both shortness of breath and knee pain.  (R. 509.)  Dr. Martin assessed the

5

following: "Based on her history and exam, I do not think she has significant heart failure.  Given that her symptoms are more prominent over the last month or so, I think we should check a chest x-ray, BNP, and of course her yearly echo. . . . [S]hould there be no objective evidence of heart failure, other possible causes will need to be considered." (*Id.*)  He planned to forward copies of testing to Dr. Wellmon, adjust Plaintiff's medical regimen if necessary, and see Plaintiff again in one year.  (R. 510.)

A December 18, 2009, diagnostic study showed that the heart was mildly enlarged.  (R. 391.)  The Impression was: "Cardiomegaly, Status post median sternotomy. No CHF, pleural effusion, or acute process demonstrated." (*Id.*)

On November 19, 2010, Dr. Martin again saw Plaintiff for a cardiovascular follow-up and corresponded with Dr. Wellmon about the visit.  (R. 515.)  He reported the following: "From a Cardiovascular standpoint she has been stable.  She did complain of heaviness in her chest this past summer, this prompted an evaluation and period of observation in the emergency department at the Chambersburg Hospital.  No acute cardiac issues were identified. . . . [H]er main complaint is that of fatigue." (*Id.*) Dr. Martin adjusted Plaintiff's medications and planned to see her in six months.  (R. 516.)

At an office visit with Dr. Wellmon on January 28, 2011,

Plaintiff complained of recently feeling dizzy and lightheaded, occasional chest pain, and right arm numbness. (R. 442.) A chest ECG showed no evidence of a current problem, but Plaintiff was directed to follow up with cardiology if her symptoms returned. (*Id.*) Dr. Wellmon noted that her chest complaints could have a possible peptic etiology or possibly "concaved" by stress Plaintiff stated she had been having recently. (*Id.*)

On July 29, 2011, Plaintiff saw Dr. Wellmon with complaints of chest discomfort and tightness over one to two weeks while coughing or taking a deep breath. (R. 438.) Plaintiff also complained of right arm numbness and heaviness, occasional lightheadedness, and a marked increase in fatigue, but no shortness of breath. (*Id.*) Dr. Wellmon consulted with Dr. Iskander at the Moffit Heart & Vascular Group, and Dr. Iskander recommended that Plaintiff go to the Emergency Room for labs and further evaluation. (*Id.*) Plaintiff was offered options, including going to the ER via ambulance, but Plaintiff opted to go home and discuss the matter with her husband. (*Id.*) Plaintiff's current medication list included Ultram, 50 milligrams 4 times a day for pain. (*Id.*)

On the same date, Plaintiff went to the Carlisle Regional Medical Center ("CRMC") and was admitted based on her symptoms. (R. 414.) Because of the numbness, Plaintiff had a consult with Mohammad K. Ismail, M.D., who assessed Plaintiff to have multiple factors for cerebrovascular disease. (R. 414.) His differential

7

diagnosis included reversible ischemic neurological deficit and complex migraines.  (*Id.*)  He also noted that she was subtherapeutic on Coumadin.  (*Id.*)

While hospitalized, Plaintiff also had a consultation with Jeffrey S. Mandak, M.D., of the Moffit Heart & Vascular Group.  (R. 583.)  He opined that her symptoms seemed more gastrointestinal in nature.  (R. 584.)

Upon discharge on August 1, 2011, the CRMC report noted that Plaintiff's cardiac enzymes were followed during her hospital stay and were negative.  (R. 416.)  She developed symptoms that were more in the midepigastric and right upper quadrant area, and worse after eating.  (*Id.*)  Ultrasound of her gallbladder was unremarkable and her symptoms improved with metoprolol.  (*Id.*)

On April 2, 2012, a report of Plaintiff's cardiovascular follow-up was sent to Daniel Hely, M.D., of Appalachian Orthopedic Center in anticipation of total knee surgery.  (R. 683.)  Dr. Martin noted that Plaintiff reported some chest discomfort when she lifts heavier objects, something which has occurred chronically since her surgery.  (*Id.*)  He assessed that Plaintiff did not exhibit any evidence for congestive heart flutter, she appeared to be in sinus rhythm, her 2011 echocardiogram suggested low-normal systolic function with EF of 50%, and she had normal function of her mechanical prosthetic aortic valve.  (*Id.*)

8

b.   **Knee Impairment**

On September 26, 2008, Dr. Wellmon noted that he would make arrangements for an orthopedic consultation to address Plaintiff's knee pain, pain which Plaintiff described felt like a hot poker through her knee.  (R. 453.)

On February 12, 2009, Daniel Hely, M.D., performed an arthroscopic medial meniscectomy of the right knee based on the diagnosis of a medial meniscal tear.  (R. 614.)  At her March 13, 2009, follow-up visit, Plaintiff showed steady improvement and no apparent complications.  (R. 605.)

On August 7, 2009, Dr. Hely reported that Plaintiff had ongoing symptoms of pain.  (R. 590.)  On examination, he found swelling, an antalgic gait, full extension and pain with flexion greater than 120 degrees, and valgus stress produced pain.  (*Id.*)  His impression was "[r]efractory symptoms of pain secondary to degenerative arthritis post meniscectomy."  (*Id.*)  Dr. Hely's plan was activity based on symptoms, over-the-counter anti-inflammatory medication, gentle motion and strengthening exercises, and follow-up if things did not stay quiet.  (*Id.*)

On November 12, 2009, Dr. Wellmon reported that Plaintiff's pain appeared stable with regard to osteoarthritis of her knees. (R. 450.)  At the time Plaintiff was taking Vicodin every six hours for pain.  (*Id.*)

Plaintiff was in an automobile accident on May 1, 2010, and

9

injured her right knee.  (R. 536.)  She was seen at Orthopaedic Associates on May 17, 2010, (*id.*) and continued follow-up there for two months (R. 537-38).  Physical therapy made her knee feel worse and a Neoprene brace, ice, elevation and anti-inflammatories were recommended.  (R. 537.)  By July 16, 2010, it was reported that her knee was doing reasonably well but Plaintiff still complained of discomfort with standing and walking.  (*Id.*)  The reporter opined that the accident probably aggravated the arthritic condition of the knee.  (*Id.*)  Plaintiff was instructed to do exercises and informed that she may sometime need knee replacement surgery.  (R. 538.)  Plaintiff declined a knee injection.  (*Id.*)

On July 29, 2011, notes from Plaintiff's office visit with Dr. Wellmon indicate her current medications included Ultram, 50 milligrams 4 times a day for pain.  (R. 438.)

Plaintiff was seen by Tom Albert, M.D., at Summit Orthopaedics for her knee problem on October 7, 2011.  (R. 718.)  Dr. Albert assessed Plaintiff to have medial compartment bone on bone osteoarthritis.  (*Id.*)  He discussed with her that the next step for her surgically would be a knee replacement surgery, adding that "[o]ther options would be corticosteroid injection, anti-inflammatories as she has had many corticosteroid injections and Visco supplements in the past and has not had relief with that." (*Id.*)  Plaintiff indicated she wanted to hold off on surgery, something Dr. Martin found reasonable.  (*Id.*)

10

On January 19, 2012, Plaintiff saw Dr. Wellmon for a variety of complaints and he noted that her exam was "unremarkable."  (R. 739.)  Her list of current medications included Ultram, 50 milligrams 4 times a day for pain.  (*Id.*)

April 2, 2012, correspondence from Plaintiff's cardiologist to Daniel P. Hely, M.D., of Appalachian Orthopedic Center, regarding Plaintiff's total knee surgery scheduled for April 24, 2012, indicates that Plaintiff had informed him she was quite limited by her knee pain, that she had to sit frequently because of knee discomfort, and had been more sedentary because of the knee pain. (R. 683.)

Plaintiff had partial knee replacement surgery on April 24, 2012.  (R. 670.)  The surgery was uneventful and Plaintiff was discharged on April 27, 2012.  (*Id.*)  At a follow-up office visit on May 7, 2012, Dr. Hely noted that Plaintiff was having "a remarkably smooth course with very little difficulty" and no apparent complications.  (*Id.*)  At her six-week post operative visit on June 4, 2012, Dr. Hely found no significant functional problem but Plaintiff was continuing to have hypersensitivity at the site of the surgical wound.  (R. 713.)  He found no sign of inflammation, full extension and flexion to well over 90 degrees, no tenderness medially or laterally, and some hyperesthesia over the surgical wound.  (*Id.*)  He assessed Plaintiff to have "slow improvement."  (*Id.*)

On August 10, 2012, Plaintiff had an office visit with Dr. Wellmon and wanted "to have forms completed from attorney."  (R. 736.)  Among other things, Dr. Wellmon noted that Plaintiff's pains were mainly in her knees requiring symptom management.  (*Id.*)

On September 7, 2012, Plaintiff again saw Dr. Hely.  (R. 755.) He recorded that she was still having ongoing difficulty with the right knee and had been unable to advance to full work activity. (*Id.*)  Examination showed a well-healed surgical scar, full extension and flexion to over 120 degrees, normal gait, and no tenderness on direct palpation.  (*Id.*)  Dr. Hely recommended that Plaintiff advance activity as pain allowed, continue motion and strengthening exercises, and follow up with him in three months. (*Id.*)

**2.   Summary of Evidence of Mental Impairments**

At Plaintiff's June 16, 2008, office visit with cardiologist Robert Martin, M.D., Plaintiff's occasional shortness of breath at night was discussed.  As previously noted, in his report to Dr. Wellmon Dr. Martin stated that Plaintiff had been under a lot of stress due to her continued unemployment and financial difficulties at home.  (R. 565.)

Plaintiff saw Dr. Wellmon on September 26, 2008, with complaints of shortness of breath, knee pain, lack of sleep, and feeling irritable and moody.  (R. 453.)  At the time Plaintiff's

medications included Lexapro.[1]   (*Id.*)

On November 24, 2008, Plaintiff saw Dr. Wellmon in part because she needed a letter.  (R. 452.)  He noted that he drafted a letter about Plaintiff's "chronic health conditions and her medical status."  (*Id.*)  At the time Plaintiff's medications included Lexapro. (*Id.*)

At Plaintiff's November 12, 2009, visit with Dr. Wellmon, Plaintiff's list of current medications included Lexapro.  (R. 450.)  Dr. Wellmon decided on a trial of Trazodone to address Plaintiff's difficulty sleeping and her anxiety.  (*Id.*)

On February 24, 2010, Plaintiff reported to Dr. Wellmon that she had discontinued taking Lexapro several weeks before her office visit and was not interested in resuming antidepressant therapy. (R. 449.)  She discussed her lack of sexual desire and relationship issues with her husband, including his frequent verbal and occasional physical abuse; Dr. Wellmon highly recommended counseling.  (*Id.*)

At Plaintiff's April 26, 2010, office visit with Dr. Wellmon, Plaintiff had questions regarding menopause, decreased libido, crying jags, and insomnia.  (R. 658.)  Plaintiff reported she was having difficulty getting counseling because of insurance and

---

[1]     Lexapro (generic name Escitalopram Oxalate) is used to treat depression and anxiety. http://www.webmd.com/richmedia/fif.html?v=2&appId=a6e13928-d187-488e-9732-f768.

transportation issues. (Id.) Dr. Wellmon noted it was hard to distinguish if Plaintiff's symptoms were menopausal or depression, but he decided to try her on Paxil and consider alternative menopausal relief if she failed to respond. (*Id.)*

On May 11, 2010, and August 20, 2010, Plaintiff's list of current medications included Paxil. (R. 443, 445.)

On January 28, 2011, Plaintiff saw Dr. Wellmon with complaints of feeling dizzy and lightheaded as well as occasional chest pain and right arm numbness. (R. 442.) Dr. Wellmon noted that Plaintiff's chest complaints may be "concaved" by the stress she reported having. (*Id.*) Plaintiff's current medication list did not include Paxil, Lexapro, or Trazadone. (*Id.*)

On March 21, 2011, Plaintiff saw Dr. Wellmon for a PAP exam and also discussed her desire to lose weight and decreased libido. (R. 441.) Dr. Wellmon noted that Plaintiff "is not an active individual and has difficulty exercising due to her knee issues." (*Id.*) He recommended low impact cardio workouts along with diet modification. (*Id.*) Dr. Wellmon also discussed with Plaintiff the possibility that her decreased libido was part of her depression issue. (*Id.*) He referred Plaintiff for counseling, noting that he would place her on antidepressant therapy if recommended by counseling. (*Id.*)

The July 30, 2011, consultation report from Dr. Jeffrey Mandak includes depression under "Medical History." (R. 583.)

14

In the August 1, 2011, Discharge Report from Carlisle Regional Medical Center, "Discharge Diagnoses" include "depression."  (R. 415.)

At Plaintiff's July 19, 2012, office visit with Dr. Wellmon, he noted that Plaintiff was under acute stress at the time related to her psychological and emotional abuse at home.  (R. 737.) Plaintiff was tearful and trembling.  (*Id.*)  She told Dr. Wellmon that she had been in contact with the Carlisle area domestic violence group and the state assistance department but had to cancel an appointment when her husband became suspicious.  (*Id.*) While at the office, Plaintiff made a phone call to Women in Need in Chambersburg to help her relocate.  (*Id.*)  Dr. Wellmon noted that no physical assessment was done at this visit.  (*Id.*)

Plaintiff had an Initial Assessment at Cumberland-Franklin Counseling Services on August 1, 2012.  (R. 726-29.)  Plaintiff was assessed to meet the criteria for PTSD, and major depression and anxiety disorder.  (R. 727.)  Her GAF was assessed to be 45.  (*Id.*)

On August 10, 2012, Plaintiff had an office visit with Dr. Wellmon.  (R. 736.)  Depression, anxiety, and posttraumatic stress disorder were included in his list of chronic health conditions. (*Id.*)  He added that Plaintiff "is depressed tearful, feels worthless, has poor sleep at times and has shortness of breath along with dizziness and lightheadedness."  (*Id.*)  He also noted the need to complete forms regarding long-term disability.  (*Id.*)

15

Notes from Plaintiff's September 9, 2012, visit to Dr. Hely indicate that Plaintiff denied psychiatric symptoms.  (R. 756.)

**3.   Opinion Evidence**

**a.   Physical Impairments**

On February 12, 2008, at a visit following Plaintiff's January 4, 2008, aortic valve replacement surgery, her cardiologist, Dr. Robert Martin, opined that Plaintiff could return to work as a housekeeper and maintenance person.  (R. 562.)  He stated that she had "no real restrictions" but would need to be cautious because she was on Coumadin.  (*Id.*)

As noted previously, Plaintiff saw Dr. Wellmon on August 24, 2009, to discuss, among other things, filing for disability.  (R. 451.)  Plaintiff reported that she had difficulty completing home chores such as cleaning and basic homemaker duties because of fatigue and feeling "played out."  (*Id.*)  Dr. Wellmon stated that Plaintiff "is unable to work secondary to her cardiac condition with increased fatigue and poor exercise tolerance."  (*Id.*)

On May 3, 2010, Dr. Wellmon saw Plaintiff for follow-up after a May 1, 2010, car accident and noted that "[a] letter was being prepped regarding her work restrictions including no heavy lifting or moving."  (R. 657.)

On June 4, 2012, the surgeon who performed Plaintiff's knee replacement six weeks earlier, Dr. Daniel Healy, found that Plaintiff had "no significant functional problem."  (R. 713.)

On August 10, 2012, Dr. Wellmon opined that Plaintiff could tolerate low stress jobs (R. 721), that she had multiple positional and exertional limitations (R. 721-23), and that she was likely to be absent from work about four days per month as a result of her impairments.  (R. 723.)

On September 12, 2012, Dr. Hely opined that Plaintiff was having ongoing difficulty with her right knee and had not been able to advance to full work activity.  (R. 755.)  (She was to advance activity as pain allowed and do strengthening exercises.  (*Id.*))

b.   **Mental Impairments**

In the September 6, 2011, Disability Determination Explanation, State agency psychological consultant Mark Hite, Ed.D., found "[n]o mental medically determinable impairments established."  (R. 70.)

On April 26, 2010, Dr. Wellmon noted it was hard to tell if Plaintiff's symptoms were menopausal or depression.  On January 28, 2011, and March 21, 2011, Dr. Wellmon raised the possibility that Plaintiff's physical complaints may be related to stress and her "depression issue."  (R. 441, 442.)

Plaintiff was assessed to meet the criteria for PTSD, major depression and anxiety disorder at the Initial Assessment at Cumberland-Franklin Counseling Services on August 1, 2012.  (R. 727.)

At Plaintiff's office visit on August 10, 2012, PTSD, and

17

major depression and anxiety disorder were listed as chronic health conditions. (R. 736.) Dr. Wellmon included PTSD, depression, and anxiety in the diagnoses listed on the Physical Residual Functional Capacity form he completed on August 10, 2012. (R. 720.) He also noted that Plaintiff's depression, anxiety and PTSD affected her physical condition. (R. 721.)

On September 5, 2012, Licensed Professional Counselor Kelly Dryzal, who had seen Plaintiff weekly since August 1, 2012, opined that Plaintiff had anxiety and depression as well as PTSD resulting from an extensive history of abuse. (R. 730.) Ms. Dryzal noted that Plaintiff's anxiety and stress increased her physical symptoms and decreased her pain tolerance and self-care. (R. 733.) Regarding unskilled work, she found that Plaintiff was unable to meet competitive standards in three areas: working in coordination with or proximity to others without being unduly distracted; accepting instructions and responding appropriately to criticism from supervisors; and responding appropriately to changes in a routine work setting. (R. 732.) Ms. Dryzal found Plaintiff had no useful ability to function in the following three areas: maintaining attention for a two-hour segment; completing a normal workday and workweek without interruptions from psychologically based symptoms; and performing at a consistent pace without an unreasonable number and length of rest periods. (*Id.*) Regarding Plaintiff's ability to do skilled work, Ms. Dryzal determined that

Plaintiff was unable to meet competitive standards in dealing with the stress of semiskilled and skilled work.  (R. 733.)  Functional limitation findings include a moderate limitation in restriction of activities of daily living; and marked limitations with difficulties in maintaining social functioning and maintaining concentration, persistence or pace.  (R. 734.)  Ms. Dryzal also opined that Plaintiff had four or more episodes of decompensation within a twelve month period each of at least two weeks duration; she would miss four or more days a month because of her impairments; her impairments had lasted or could be expected to last at least twelve months: and she was not a malingerer.  (R. 734-35.)

4.  **ALJ Decision**

By decision of March 13, 2013, ALJ Brickell determined that Plaintiff was not disabled as defined in the Social Security Act. (R. 23.)  He made the following findings of fact and conclusions of law:

> 1.  The claimant last met the insured status requirements of the Social Security Act on December 31, 2011.
>
> 2.  The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 22, 2008 through her date last insured of December 31, 2011 (20 CFR 404-1571 *et seq*.).
>
> 3.  Through the date last insured, the claimant had the following severe impairments: status post heart valve

19

replacement, and status post right knee replacement (20 CFR 404.1520(c)).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at the medium exertional level, but with the following nonexertional limitations: The claimant needs to avoid hazards due to the risk of being cut while on her regiment of Coumadin.

6.  Through the date last insured, the claimant was capable of performing past relevant work as a cleaner and an order picker.  This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.  The claimant was not under a disability, as defined in the Social Security Act, at any time from June 22, 2008, the alleged onset date, through December 31, 2011, the date last insured (20 CFR 404.1520(f)).

(R. 14-23.)

In determining that Plaintiff's alleged affective and anxiety disorders were not medically determinable mental impairments, the ALJ gave great weight to the opinion State agency psychological consultant, Mark Hite, Ed.D., who stated the same, cited evidence from Plaintiff's primary care physician, and gave little weight to

a counselor's opinion both because of her limited treating relationship and status as a counselor.  (R.15.)

The ALJ reviewed the extensive medical evidence in making his RFC determination and explained the weight given to the opinions contained in the record.  (R. 16-22.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[2]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can

---

[2]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he
> applied for work.

42 U.S.C. § 423(d)(2)(A).

perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fourth step of the process when the ALJ found that Plaintiff was capable of performing past relevant work as a cleaner and order picker.  (R. 22.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is

22

limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence--particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

710 F.2d at 114.

    This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not

23

sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the

court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

### A. General Considerations

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here,

25

we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

### B. *Plaintiff's Alleged Errors*

As set out above, Plaintiff asserts the decision of the Social Security Administration is error for the following reasons: 1) the ALJ found Plaintiff's mental health impairment to be non-severe; 2) the ALJ failed to properly evaluate Plaintiff's treating physicians; 3) the reasons the ALJ gave for finding Plaintiff not credible as to the severity of her limitations are not supported by

26

substantial evidence; 4) the ALJ failed to adopt a clear and
supported RFC; and 5) the ALJ did not make specific findings
regarding the mental demands of Plaintiff's past work.  (Doc. 9 at
2.)

**1.    <u>Mental Health Impairments</u>**

Plaintiff maintains the ALJ erred in finding Plaintiff's
mental health impairments to be non-severe.  (Doc. 9 at 12-14.)
Defendant responds that substantial evidence supports the ALJ's
finding on this issue.  (Doc. 12 at 7-11.)  We conclude the ALJ
erred at step two in his consideration of Plaintiff's alleged
mental impairments and that this error is cause for remand.

Here the ALJ did not find Plaintiff's alleged mental health
impairments non-severe, rather he found that Plaintiff did not
suffer from a medically determinable mental health impairment.  (R.
15.)  In doing so, the ALJ gave great weight to the opinion of
State agency psychological consultant, Mark Hite, Ed.D., who stated
the same.  (R. 15, R. 70.)  The ALJ also cited evidence from
Plaintiff's primary care physician, Dr. Wellmon, where he stated
that Plaintiff's symptoms made it hard to distinguish if they were
menopausal or depression.  (R. 15.)  Other evidence from Dr.
Wellmon was discounted because he "simply noted Plaintiff's
symptoms without completing a comprehensive mental status
examination and without giving any specific mental diagnoses."
(*Id.*)  He also gave little weight to Ms. Dryzal's opinion both

because of her limited treating relationship and status as a
counselor. (*Id.*)

First, we note that the ALJ was entitled to give little weight
to Kelly Dryzal's opinion under the applicable regulation--she is
not an "acceptable medical source" as defined in 20 C.F.R. §
404.1513(a) because she is not a licenced or certified
psychologist.  Pursuant to § 404.1513(d), Ms. Dryzal's opinion is
"other source" evidence which may, but need not, be considered.[3]
*See also Chandler v. Commissioner of Social Security*, 667 F.3d 356,
361-62 (3d Cir. 2011).  While the regulation, supported by caselaw,
makes consideration of an opinion from a medical source who is not
technically deemed an "acceptable medical source," optional, SSR
06-03p, 2006 WL 2329939, at *4 (S.S.A. Aug. 9, 2006), states that
such an opinion is "important and should be evaluated on key issues
such as impairment severity and functional effects."[4]  "Social

---

[3]  To the extent the ALJ considered the opinion and discounted
Ms. Dryzal's conclusions that she had seen Plaintiff "only one time
in the previous month," Ms. Dryzal stated on September 5, 2012,
that she had seen Plaintiff weekly since August 1, 2012.  (R. 730.)

[4]  The reason provided for consideration of opinions from
medical sources which are not "acceptable medical sources" is
persuasive:

> With the growth of managed health care in
> recent years and the emphasis on containing
> medical costs, medical sources who are not
> "acceptable medical sources," such as nurse
> practitioners, physician assistants, and
> licensed clinical social workers, have
> increasingly assumed a greater percentage of

Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" *Sykes v. Apfel*, 228 F.3d 259, (3d Cir. 2000) (quoting 20 C.F.R. § 402.35(b)(1)(1999)).  Thus, the ALJ was correct to consider Ms. Dryzal's opinion.

In explaining his reasons for determining that Plaintiff's alleged affective and anxiety disorders were not medically determinable mental impairments, ALJ Brickell discounts Dr. Wellmon's notation on August 10, 2012, regarding Plaintiff's symptoms of depression, tearfulness, feelings of worthlessness and trouble sleeping because Dr. Wellmon did not complete a comprehensive mental status examination and he does not give any specific mental diagnosis with his notation of symptoms.  (*Id.*) The ALJ does not acknowledge that Dr. Wellmon listed PTSD, and major depression and anxiety disorder as *chronic* health conditions at Plaintiff's office visit on August 10, 2012 (R. 736) and Dr. Wellmon included PTSD, depression, and anxiety in the *diagnoses* listed on the Physical Residual Functional Capacity form he completed on August 10, 2012. (R. 720.)  He also identified depression, anxiety, and PTSD as psychological conditions affecting

the treatment and evaluation functions
previously handled primarily by physicians
and psychologists.

SSR 06-03p, 2006 WL 2329939, at *4

Plaintiff's physical condition.  (R. 721.)  Her identified symptoms included depression, tearfulness, feelings of worthlessness, and poor sleep (R. 720)--symptoms Dr. Wellmon found consistent with Plaintiff's diagnosed conditions and which he concluded were severe enough to frequently interfere with Plaintiff's attention and concentration needed to perform even simple work tasks.  (R. 721.)

Although these findings were made after the date last insured, the fact that Dr. Wellmon identified them as *chronic* is significant in considering Plaintiff's alleged mental impairments and their related symptoms.

Furthermore, with one exception addressed below, the ALJ does not discuss numerous references in Dr. Wellmon's office notes predating the date last insured relating to depression and anxiety, and Plaintiff's treatment with Lexapro (recorded as early as September 2008 (R. 453)), Trazadone (November 2009 (R. 450)), and Paxil (April 2010 (R. 658)) to address symptoms of anxiety and depression.  Although the ALJ correctly notes that Dr. Wellmon questioned the origin of the symptoms Plaintiff was experiencing in April 2010 (whether related to menopause of depression) (R. 658)), Plaintiff stayed on Paxil, the depression medication, through at least August 2010 (R. 443).  Importantly, the consistent references by Dr. Wellmon, Plaintiff's long-term primary care physician, to Plaintiff's anxiety and depression, as well as his correlation of Plaintiff's physical symptoms with her mental health problems (*see*,

*e.g.*, R. 442), deserved some consideration in the ALJ's discussion of this issue.

As set out above, the Acting Secretary's decision can only be deemed to be based on substantial evidence where the ALJ's analysis is sufficiently thorough. *See*, *e.g.*, *Dobrowolsky*, 606 F.2d at 406. For the reasons discussed, we cannot say that the ALJ fulfilled his duty, not only to state the evidence considered which supports the result, but also to indicate what evidence he rejected as he did not explain the rejection of probative evidence related to Plaintiff's alleged mental health impairments. *See Cotter*, 642 F.2d at 706-07.

We cannot consider the step two error harmless as Defendant urges. (*See* Doc. 12 at 10-11.)  While we have found that an alleged step two error may be harmless, *Keys v. Colvin*, Civ. A. No. 3:14-CV-191, 2015 WL 1275367, at *11 (M.D. Pa. 2015), the situation here is distinguishable.  In *Keys* and the cases relied upon therein,[5] the ALJ considered the symptoms and functional limitations associated with the non-severe impairment in his RFC analysis.  *Id.*  In finding Plaintiff's averred mental impairments

---

[5]    *Salles v. Commissioner of Social Security*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007) (not precedential) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)); *Garcia v. Commissioner of Social Security*, 587 F. App'x 367, 370 (9th Cir. 2014) (citing *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007)); *Burnside v. Colvin*, Civ. A. No. 3:13-CV-2554, 2015 WL 268791, at *13 (M.D. Pa. Jan. 21, 2015); *Lambert v. Astrue*, Civ. A. No. 08-657, 2009 WL 425603, at *13 (W.D. Pa. Feb. 19, 2009).

to be non-medically determinable, ALJ Brickell did not take into account allegedly associated symptoms and functional limitations. Thus, this error affected the ALJ's RFC analysis and cannot be deemed harmless.  For this reason, this matter must be remanded to the Acting Commissioner for further consideration.  Upon remand, all evidence relating to Plaintiff's alleged mental impairments must be evaluated pursuant to relevant regulations, caselaw, and social security rulings.

2.   **Treating Physician Opinion**

     Plaintiff asserts that the ALJ erred because he did not give proper weight to the opinions of treating physicians Baxter D. Wellmon, D.O., and Licensed Professional Counselor Kelly Dryzal.

a. **Wellmon Opinion**

     As determined in the previous section of this Memorandum, evidence related to Dr. Wellmon's treatment of Plaintiff and his opinions related to her alleged mental impairments must be reconsidered upon remand.  Because of the asserted relationship between Plaintiff's physical and mental impairments, reconsideration of one likely entails reconsideration of both and the potential reassessment of the RFC (should Plaintiff's mental impairments be deemed even non-severe).  Therefore, limited discussion of this claimed error is warranted.

     The ALJ sets out abundant medical evidence in support of his RFC assessment.  (R. 16-22.)  To the extent Dr. Wellmon's

discounted notes and opinions will be reevaluated upon remand,
Plaintiff's credibility and the weight assigned to various evidence
discussed by ALJ Brickell may also be reevaluated.  For now, we
note that medical evidence from Plaintiff's treating physicians
sometimes contradicts Plaintiff's allegations, allegations which
are not always consistent.  At times Plaintiff reports that her
knee problems prevent her from working; at times heart problems are
identified as the reason for her inability to work.  For example,
on August 1, 2012, Plaintiff indicated in her Initial Assessment at
Cumberland-Franklin Counseling Services that she had been
unemployed for over four years due to "heart surgery."  (R. 729.)
However, after her surgery in 2008, Plaintiff was cleared to work
with "no real restrictions" other than caution required because she
was on Coumadin.  (R. 562.)  On August 10, 2012, at an office visit
related to the completion of disability forms, Dr. Wellmon noted
that Plaintiff's pains were mainly in her knees requiring symptom
management; Plaintiff was taking "Ultram 50 mg one 4 x day for
pain" at the time.  (R. 736.)  However, Dr. Hely, who performed the
knee replacement surgery on April 24, 2012, found at six weeks
post-op that Plaintiff had no functional limitations but had
hypersensitivity at the site of the surgical wound.  (R. 713.)  In
September 2012, Dr. Hely reported ongoing difficulty and the fact
that Plaintiff had not been able to advance to full work activity,
but examination showed a well-healed surgical scar, full extension

33

and flexion to over 120 degrees, normal gait, and no tenderness on direct palpation.  (R. 755.)  Dr. Hely recommended that Plaintiff advance activity as pain allowed, continue motion and strengthening exercises, and follow up with him in three months.  (*Id.*)  With this assessment, Dr. Hely did not discount Plaintiff's allegations of pain, but he gave no indication that he anticipated them to be debilitating for a long period.

Given contradictory evidence, the ALJ may choose whom to credit but he must carefully explain his reasons for doing so.  *See Rutherford*, 399 F.3d at 554.  In this case some reasons for assigning little weight to Dr. Wellmon's opinion are troublesome. For example, ALJ Brickell undermined Dr. Wellmon's opinion because it was inconsistent with his treating notes, including his January 19, 2012, finding that "Patient's exam is unremarkable."  (R. 21.) However, an "unremarkable exam" on a given day does not necessarily equate with an absence of disabling symptoms overall, especially where a plaintiff reportedly has good days and bad days (R. 723) and the "Current Medications" list at the time of the exam lists nine medications, including "Ultram 50 mg one 4 x day for pain" (R. 739).  Similarly, the ALJ's reliance on the fact that Plaintiff did not report any problems with her knees or heart condition at her July 19, 2012, office visit is a snapshot of an isolated day when Plaintiff "was under acute distress related to her psychological and emotional abuse at home[,] . . . [n]o physical assessment was

34

done at the visit," and the "Current Medications" list at the time of the exam lists ten medications, including "Ultram 50 mg one 4 x day for pain." (R. 737.) Because remand is otherwise required for reconsideration of the ALJ's step two determination, a more contextual analysis of Dr. Wellmon's notes and opinion should be undertaken.

**b.    Dryzal Opinion**

As discussed previously, Ms. Dryzal's opinion warranted consideration pursuant to SSR 06-03p. Upon remand, her opinion should be evaluated consistent with the requirements found in SSR 06-03p. 2006 WL 2329939, at *4-5.

**3.    Credibility**

Plaintiff asserts that the reasons the ALJ cites for finding Plaintiff not credible are not supported by substantial evidence. (Doc. 9 at 17-19.) Plaintiff takes issue with two aspects of the ALJ's credibility determination: his reliance on Plaintiff's testimony that she takes only over-the-counter pain medication and his interpretation of her activities of daily living. (Doc. 9 at 18.) Defendant responds that substantial evidence supports the credibility determination. (Doc. 12 at 18-23.) We conclude the ALJ's credibility findings should be reevaluated on remand.

The Third Circuit Court of Appeals has stated that "[w]e 'ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's

demeanor.'"  *Coleman v. Commissioner of Social Security*, 440 F.

App'x 252, 253 (3d Cir. 2012) (not precedential) (quoting *Reefer v.*

*Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)).  "Credibility

determinations are the province of the ALJ and should only be

disturbed on review if not supported by substantial evidence."

*Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *3 (E.D.

Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717 F.2d 871, 873

(3d Cir. 1983)).

Social Security Ruling 96-7p provides the following guidance

regarding the evaluation of a claimant's statements about his or

her symptoms:

> In general, the extent to which an
> individual's statements about symptoms can be
> relied upon as probative evidence in
> determining whether the individual is
> disabled depends on the credibility of the
> statements.  In basic terms, the credibility
> of an individual's statements about pain or
> other symptoms and their functional effects
> is the degree to which the statements can be
> believed and accepted as true.  When
> evaluating the credibility of an individual's
> statements, the adjudicator must consider the
> entire case record and give specific reasons
> for the weight given to the individual's
> statements.

SSR 96-7p.  "One strong indication of the credibility of an

individual's statements is their consistency, both internally and

with other information in the case record."  SSR 96-7p.

The Social Security Regulations provide a framework under

which a claimant's subjective complaints are to be considered.  20

36

C.F.R. § 404.1529.  First, symptoms such as pain, shortness of breath, and fatigue will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings.  20 C.F.R. § 404.1529(b).  Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work.  *Id.*  In so doing, the medical evidence of record is considered along with the claimant's statements.  *Id.*

The regulations provide that factors which will be considered relevant to symptoms such as pain are the following: activities of daily living; the location, duration, frequency and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medications taken to alleviate symptoms; treatment received other than medication intended to relieve pain or other symptoms; other measures used for pain/symptom relief; and other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i-vii), 416.929(c)(3)(i-vii).

The Third Circuit has explained:

> An ALJ must give serious consideration
> to a claimant's subjective complaints of

37

> pain, even where those complaints are not
> supported by objective evidence. *Ferguson v.
> Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985).
> "While there must be objective evidence of
> some condition that could reasonably produce
> pain, there need not be objective evidence of
> the pain itself." *Green* [*v. Schweiker*, 749
> F.2d 1066, 1071 (3d Cir. 1984)].  Where
> medical evidence does support a claimant's
> complaints of pain, the complaints should
> then be given "great weight" and may not be
> disregarded unless there exists contradictory
> medical evidence. *Carter* [*v. Railroad
> Retirement Bd.*, 834 F.2d 62, 65 (3d Cir.
> 1987)]; *Ferguson*, 765 F.2d at 37.

*Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993).

Here the ALJ reviewed relevant factors in making his credibility determination, including the type and side effects of medication and Plaintiff's activities of daily living.  (R. 17-18.) Regarding medication, the ALJ stated: "The claimant testified that she has no side effects from her medication and takes nothing stronger than over-the-counter medication for pain."  (R. 17.) Plaintiff's testimony and our review of the record indicate that this statement does not accurately portray evidence of record. When asked about the medications she was taking at the time of the hearing, Plaintiff first identified Morfran because of her heart valve and Metoprolol for regulation of her heart beat.  (R. 40.) She then added that she takes over-the-counter medication "for a headache, or something like that."  (R. 40-41.)  The ALJ does not mention Plaintiff's testimony that she had taken stronger medication in the past for her knee pain.  (*See* R. 41.)  While

38

Plaintiff may not have been taking anything stronger than over-the-counter medication for pain at the time of the hearing, the record indicates that Plaintiff had periodically been prescribed stronger pain medication: Dr. Wellmon's September 26, 2008, office note indicates Celebrex was  on the list of "Current Medications"; Ultram was on the list of "Current Medications" contained in Dr. Wellmon's office notes on numerous occasions (*see*, *e.g.*, July 29, 2011 (R. 438), January 19, 2012 (R. 739), July 19, 2012 (R. 737), August 10, 2012 (R. 736)); and Vicodin was prescribed on at least one occasion (November 12, 2009 (R. 450)).[6]  Similarly, in answer to the question of whether she had side effects from her medication, Plaintiff first testified "I -- not -- no, I don't think." (R. 41.)  However, she went on to explain the complications of controlling her blood thinner medication, including increased moodiness and fatigue when levels are off.  (R. 41-42.)  While perhaps not technically "side effects" of medication, Plaintiff's testimony about the problems she believes to be associated with control of the level of her blood thinners may be relevant to Plaintiff's reports of fatigue and intermittent

---

[6]  Celebrex (generic name Celecoxib) is a non-steroidal anti-inflammatory which relieves pain and swelling. http://webmd.com/drugs/2/drug-16849/celebrex-oral/details.  Ultram (generic name Tramadol) is used to help relieve moderate to severe pain.  http://webmd.com/drugs/2/drug-4398-5239/tramadol-oral/details.  Vicodin (generic name Hydrocodone Bitartrate/Aceptaminophen) is used to relieve moderate to severe pain; it contains a narcotic and non-narcotic pain reliever. http://webmd.com/drugs/2/drug-3459/vicodin-oral/details.

39

"bad days."[7]  (*See*, *e.g.*, R. 42, 50.)

In sum, Plaintiff's history of intermittent use of prescription pain medication and testimony about problems associated with medications deserve some discussion and recognition in the consideration of Plaintiff's credibility  and formulation of the RFC.

Plaintiff's claimed error regarding the ALJ's finding inconsistency in activities of daily living (Doc. 9 at 18-19) is not without merit.  However, because remand is required on matters which bear on Plaintiff's credibility, further discussion on this matter is not necessary.

## 4. Residual Functional Capacity Support

Plaintiff identifies two specific problems with the ALJ's assessment that Plaintiff is capable of performing a full range of work at the medium exertional level: the ALJ erred in classifying Plaintiff's RFC as consistent with medium work; and the ALJ failed to incorporate and assess the limiting affects of Plaintiff's obesity.  (Doc. 9 at 20-22.)  Defendant responds that the ALJ, having followed tests set out in SSR 82-61 for determining whether

---

[7]  Testimony regarding the need to adjust medication is supported by the record.  (*See*, *e.g.*, R. 442, 739.)  We also note that Dr. Wellmon indicated Plaintiff did not have side effects of medication such as "drowsiness, dizziness, nausea, etc."  (R. 720.)  However, the fact that Dr. Wellmon did not find these side effects relevant does not mean that Plaintiff does not experience difficulties related to the control of her heart medications.  This is a matter that may be pertinent to a comprehensive RFC determination upon remand.

a claimant can perform past relevant work, properly determined that Plaintiff could perform her past relevant work at step four.  (Doc. 12 at 23-26.)  With her reply, Plaintiff adds that the ALJ's step four finding is deficient because he does not follow the requirements of SSR 82-62.  (Doc. 13 at 11.)  Because remand is required on grounds that may impact Plaintiff's RFC, extensive discussion of the issues raised with this claimed error is not necessary.

One matter which requires brief consideration is Plaintiff's assertion that the ALJ erred in failing to consider her obesity. (Doc. 9 at 21.)  As averred by Plaintiff, her weight falls in the obese category.  Defendant does not deny this.  Defendant is correct that Plaintiff has not listed obesity as an impairment nor argued that she is limited by it.

SSR 02-01p addresses how obesity is to be evaluated in disability claims.  SSR 02-01p, 67 FR 57859-02, 2002 WL 31026506 (F.R. Sept. 12, 2002).  The ruling states that adjudicators are reminded to consider the effects of obesity when evaluating disability and its combined effects with other impairments.  *Id.* The effects of obesity are not only to be assessed under the listings, but also at other steps of the sequential evaluation process, including when assessing the claimant's RFC.  *Id.*  In considering whether obesity is a medically determinable impairment, SSR 02-01p addresses the situation where the case does not include

41

a diagnosis of obesity, but does include clinical notes or other medical records showing consistently high body weight or BMI.  *Id.* The ruling states that a medical source may be asked to clarify whether the claimant has obesity, and "in most such cases we will use our judgment to establish the presence of obesity based on the medical findings and other evidence in the case record, even if a treating or examining source has not indicated a diagnosis of obesity."  *Id.*  An individual's weight over time is considered in the evaluation.  *Id.*

Courts have determined that where the plaintiff failed to raise the issue of obesity but the ALJ independently considered it, the reviewing court was obligated to review the issue.  *See*, *e.g.*, *Buchanan v. Colvin*, Civ. A. No. 2:11-CV-4597-CDJ, 2014 WL 351577, at * 1 (E.D. Pa. Jan. 30, 2014).  In *Buchanan*, the parties agreed that an ALJ is always required to consider obesity, regardless of whether a claimant raises the issue in the first instance.  *Id.* (citing *Ellis v. Astrue*, Civ. A. No. 09-CV-1212, 2010 WL 1817246, at *4 (E.D. Pa. Apr. 30, 2010)).  However, in *Perry v. Commissioner*, 136 F. App'x 461, 462 (3d Cir. 2005) (not precedential), our appellate court held that the ALJ did not err when he did not include obesity in his analysis and decision where the claimant did not address the issue of obesity in her complaint, either with the district court or in the administrative proceedings, and raised the claim for the first time in the

plaintiff's brief.

Although remand would not be required under *Perry*, we conclude that, because this case is remanded on other issues, consideration of Plaintiff's obesity claim is warranted upon remand.  Here there is no evidence in the record that Plaintiff has been diagnosed as obese by any of her medical providers.  However, the issue of Plaintiff's weight was noted in the record (R. 441, 565) and other medical records show consistently high body weight or BMI (*see*, *e.g.*, R. 442, 449, 509, 515, 706, 739).  Direct references to weight found in the record include a June 16, 2008, notation from Dr. Martin that Plaintiff was wondering whether the shortness of breath she was experiencing could be related to her weight gain over the preceding few months (R. 565) and a March 21, 2011, notation by Dr. Wellmon that Plaintiff wanted to discuss weight loss at her office visit on that date (R. 441).  Regarding Plaintiff's weight gain, Dr. Wellmon stated that she "is not an active individual and has difficulty exercising due to her knee issues."  (*Id.*)  He recommended low impact cardio workouts along with diet modification.  (*Id.*)

Given the information about Plaintiff's weight contained in the record, upon remand a medical source may be asked to clarify whether Plaintiff has obesity and a proper analysis pursuant to SSR 02-01p is to be undertaken.

5.   **Mental Demands of Past Work**

    Plaintiff's final claimed error also relates to the ALJ's step four findings--the ALJ did not follow SSR 82-62 in determining that Plaintiff could perform her past relevant work, particularly that the ALJ should have made specific findings regarding whether Plaintiff's mental impairment is compatible with the performance of the past relevant work.  (Doc. 9 at 23.)  Because the ALJ did not find that Plaintiff's claimed mental impairment was a medically determinable impairment, he would not have undertaken the analysis suggested by Plaintiff.  Upon remand, Plaintiff's claimed mental impairment is to be reevaluated and, if found to be medically determinable, the analysis at every succeeding step in the evaluation process will be affected, including consideration of SSR 82-62 at step four.

### V. Conclusion

    For the reasons discussed above, we conclude Plaintiff's appeal is properly granted.  This matter is remanded to the Acting Commissioner for further consideration consistent with this opinion.  An appropriate Order is filed simultaneously with this Memorandum.


                              S/Richard P. Conaboy
                              RICHARD P. CONABOY
                              United States District Judge

DATED: April 1, 2015


44